J. H. WHITELEY and Wayne Whiteley, Plaintiffs,

v.

FOREMOST DAIRIES, Inc., Guy Horner, and Keith Skelton, Defendants.

Civ. A. No. 334.

United States District Court
W. D. Arkansas,
Fayetteville Division.

June 19, 1957.

James R. Hale, Rex W. Perkins, Fayetteville, Ark., for plaintiffs.

Barber, Henry, Thurman & McCaskill, Little Rock, Ark., Greenhaw & Greenhaw, John H. Joyce, Fayetteville, Ark., Harper, Harper, & Young, Ft. Smith, Ark., for defendants.

JOHN E. MILLER, District Judge.

The complaint was filed December 15, 1956. The plaintiffs asserted jurisdic-

tion upon two grounds: (1) diversity and the amount involved, and (2) the provisions of the Sherman Anti-Trust Act and Clayton Act, Title 15 U.S.C.A. §§ 1, 2, 12, and 15. The plaintiffs alleged that the defendant dairy at all times material had been engaged "in the purchase, collection, and transportation of whole milk produced by farmers, dairymen and other producers, and the transportation of said milk in interstate commerce, in its trucks and other equipment, from Springdale, Arkansas, to Dallas, Texas, and to other points outside the State of Arkansas".

That there had been for many years various milk routes throughout Washington County, Arkansas, on which the "owners gather, collect and transport whole milk from the farmers, dairymen and other producers, and which said whole milk is transported and delivered to various milk buyers, outlets, and consumers located outside the State of Arkansas". That under the long and well-established custom all of said milk routes, including the milk route herein involved, have become and are valuable property rights "belonging to the person who operates the trucks and other vehicles thereon for the gathering, collection, picking up and transportation of the whole milk from the farmers, dairymen and producers thereon".

Prior to November 1, 1954, Lloyd Sloan and O. J. Snyder owned and operated milk route No. 800, having purchased the same from the original operator of the route; that the said Sloan and Snyder throughout the period of their operation of the route delivered the Grade A milk collected thereon to the defendant dairy's place of business in Springdale, Arkansas.

That on or about November 1, 1954, the plaintiffs purchased the said route for a cash consideration of $6,000, which purchase by the plaintiffs and sale by Sloan and Snyder was well known and consented to by the defendant dairy.

During the latter part of 1955, one Carl Ishmael offered to pay plaintiffs $7,000 in cash for said route, and at the request of plaintiffs the defendant dairy gave its consent for the sale of said route to the said Ishmael, but the said Ishmael could not raise the necessary $7,000, and the contemplated sale was not consummated.

In the early part of January, 1956, the plaintiffs began negotiations with one Robert Oxford for the sale of the route for the sum of $7,500, whereupon all of the defendants refused to give their consent to the sale of the said route to the said Oxford, and by reason of the wrongful and unlawful conduct on the part of the defendants the plaintiffs lost the sale of the said route to the said Oxford. On or about January 9, 1956, the defendants orally notified plaintiffs that they "intended to take possession of and assume operation of said milk route themselves, beginning on the morning of January 10, 1956; and on January 10, 1956, the defendants did wrongfully and unlawfully take possession of said milk route and began the operation of their own milk trucks thereon and wrongfully and unlawfully ejected the plaintiffs from said milk route and prevented and prohibited the plaintiffs from operating their trucks on said milk route and from picking up the milk from same, and converted said milk route to their own use".

That the said Sloan and Snyder from whom plaintiffs acquired the route had acquired, encouraged, arranged, solicited, induced, and procured the business and good will of the producers on the said milk route, and had by reason of such efforts caused the producers to sell their milk to the defendant dairy.

"On and prior to January 9, 1955, the defendants, in violation of the Sherman Anti-Trust Act, Title 15, U.S.C., Sections 1, 2, 12, and 15, combined, confederated, and conspired among themselves and with other parties at present to the plaintiffs unknown, with the wrongful and unlawful intent and purpose to convert the said milk route No. 800 to their own use and thereby to hinder, burden, restrain, and interfere with the flow of and interstate commerce in said milk from the State of Arkansas

to other states, and the actions of the said defendants in the conversion of said milk route to their own use and in depriving the plaintiffs of the benefits and enjoyment thereof has constituted and now constitutes a serious and material hindrance, burden, restraint, and interference with trade and commerce in said milk between the State of Arkansas and other states, and on account of said conversion the plaintiffs herein have been injured and damaged in their business and property in the sum of $7,500, which was the actual, fair market value of said milk route at the time of the wrongful conversion thereof by the defendants."

The plaintiffs pray for the recovery of $7,500 as their actual damages and for treble damages under Title 15, U.S.C.A. § 15, in the sum of $22,500.

On February 26, 1957, the plaintiffs filed an amendment to their complaint by adding thereto numbered paragraphs 12, 13, and 14.

In numbered paragraph 12 of the amendment to the complaint the plaintiffs alleged that the defendants owned and operated a number of other milk routes in Washington County, Arkansas, from which they collected, acquired, and purchased whole milk; that the amount of milk so obtained by defendants constitutes a substantial and material amount of the whole milk produced in Washington County, Arkansas, and in Northwest Arkansas.

In numbered paragraph 13 the plaintiffs alleged that the 26 farmers, dairymen, and other producers on milk route No. 800 herein involved produced a material and substantial amount of all the whole milk produced in Washington County, Arkansas.

In numbered paragraph 14 the plaintiffs alleged that the conversion by the defendants of milk route No. 800 herein involved "was but part and parcel of the said combination, confederation, and conspiracy by the defendants hereinabove mentioned, and the said milk route No. 800 was so converted by the defendants to their own use with the

wrongful, willful, arbitrary, capricious, and unlawful intent and purpose to cause and result in, and has caused and resulted in, all of the following, in violation of the provisions of the Sherman Anti-Trust Act:

"(a) The creation and establishment by the defendants of a monopoly in the purchase, acquisition, picking up and transportation in interstate commerce of all of the whole milk produced by all of the farmers, dairymen, and other producers of whole milk in Washington County, Arkansas, and in Northwest Arkansas.

"(b) The destruction of all competition with the defendants in the purchase, acquisition, picking up and transportation in interstate commerce of all of the whole milk produced by all of the farmers, dairymen, and other producers of whole milk in Washington County, Arkansas, and in Northwest Arkansas.

"(c) The destruction of the said milk route No. 800 belonging to the plaintiffs, and the denial of the right of the plaintiffs to acquire and pick up all of the whole milk produced by all of the producers situated thereon and to transport said milk, or to cause said milk to be transported, in interstate commerce by persons or firms other than the defendants.

"(d) The narrowing and restraint of the market for all of the whole milk produced by all of the producers of whole milk located upon and along the said milk route No. 800.

"(e) The narrowing and restraint upon the transportation in interstate commerce of all of the whole milk produced by all of the producers of whole milk located in Washington County, Arkansas, and Northwest Arkansas."

On April 24, 1957, the defendant Keith Skelton filed his separate answer in which he admitted the allegations of

citizenship contained in the complaint of plaintiffs, but denied that the Court has jurisdiction under the provisions of Title 15, Sections 1, 2, 12, and 15 U.S. C.A. He denied that he is or has been at any time an agent, servant, or employee of the defendant dairy. He denied specifically all other allegations in the complaint.

On April 25, 1957, the defendants, Foremost Dairies, Inc., and Guy Horner, filed their joint answer in which they admitted the residence of the parties and the presence of an amount in excess of $3,000, but denied that the Court has jurisdiction of the action under the provisions of Title 15 U.S.C.A. §§ 1, 2, 12, and 15. They denied that they had converted said alleged milk route or that they had done any act in contravention of the terms and provisions of the Sherman Anti-Trust Act.

They further alleged that the plaintiffs by verbal arrangement with the defendant began delivering Grade A milk to the defendant dairy on or about November 1, 1954; that the plaintiffs were to furnish a properly equipped truck for the transportation of said milk, and that such arrangement continued until about January 9, 1956, at which time the defendant dairy advised the plaintiffs that "it no longer could purchase milk which plaintiffs hauled on the route in question for the reason that at the instance of the producers on said route, Skelton Brothers would become a hauler of the milk on the route in question and the defendant, Foremost Dairies, Inc., would not receive and purchase any further milk hauled by the plaintiffs on said route".

During the period of operation by the plaintiffs the producers made many complaints with reference to the manner in which plaintiffs transported their milk, stating "that the truck operated by plaintiffs was kept in an unsanitary condition, that the driver thereof was likewise unsanitary in his operations, that plaintiffs carelessly and negligently spilled the milk of the producers, lost their containers filled with milk, and failed to pick up the milk at the time or times when it was necessary to do so in order to maintain the quality of the milk, and failed to deliver to producers weight records of their milk, and the producers advised the defendant that unless some other arrangement was made for transporting their milk that they, the producers, would sell their milk to other dairies and cause same to be transported in a proper manner. The complaints as set forth herein were made not only to the defendant, Foremost Dairies, Inc., but likewise to the plaintiffs herein on many occasions, and thereafter plaintiffs failed and refused to change their method of operation to the satisfaction of the said producers."

That prior to the time plaintiffs purchased the equipment from Sloan and Snyder, they were advised that the said Sloan and Snyder did not own a route and that all plaintiffs would acquire would be the equipment for hauling milk.

"That the plaintiffs had no contract, either written or oral, with the producers for hauling said milk, and the producers could at any time they saw fit haul their milk with their own equipment or employ anyone else other than plaintiffs to haul it, and the defendant, Foremost Dairies, Inc., further states that the plaintiffs had no route which they could sell and none which the defendants could convert, and this defendant denies that it ever converted any route as alleged in the complaint."

The defendant dairy further alleged:

"That at the time plaintiffs herein ceased to serve the route of the producers in question in a satisfactory manner to said producers that Skelton Brothers took over and began the hauling of milk on the route in question at the instance of the producers, and on the same terms and conditions as had been in effect with the plaintiffs and the defendant, Foremost Dairies, Inc., during the period in which the plaintiffs served said route, and that the defendant, Foremost Dairies, Inc., had no interest in the matter other than that the producers be properly served to the end that it, the

defendant, would receive Grade A milk in a proper manner and in such condition as to meet the inspection and approval of the health inspectors of said products."

That the plaintiffs breached the terms of the contract with the defendant by failing to perform thereunder, and as a result of said breach said contract was terminated by the defendant on the 9th day of January, 1956.

The defendant, Guy Horner, alleged that at all times during the period in question he was an employee of the defendant, Foremost Dairies, Inc., and that his efforts on behalf of the defendant, Foremost Dairies, Inc., "was attempting to aid the producers and the haulers of their milk to the end that the highest quality of milk would be produced, maintained by said producers and delivered to Foremost Dairies, Inc., in Dallas, Texas, in a manner that would meet inspection of the health authorities and that producers would receive therefrom proper compensation for their products".

Upon the issues as joined by the pleadings, the case proceeded to trial on May 14 and 15, 1957, to the Court without a jury. At the conclusion of the introduction of all the evidence, the plaintiffs dismissed their complaint and amendment thereto as against the defendant, Keith Skelton, leaving only before the Court the claims of plaintiffs as against the defendants, Foremost Dairies, Inc., and its employee, Guy Horner. The Court took the case under advisement pending receipt of briefs from the parties in support of their respective contentions. The briefs have been received and considered along with the pleadings and evidence, and the Court now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

### Findings of Fact

1.

Plaintiffs are citizens and residents of the State of Oklahoma. The defendant, Guy Horner, is a citizen and resident of the State of Arkansas, and the defendant, Foremost Dairies, Inc., (herein-after referred to as defendant dairy) is a New York corporation doing business in the State of Arkansas.

2.

In the spring of 1951 the defendant dairy explored the possibility of opening a milk route in Washington County, Arkansas, to obtain Grade A milk for sale in the City of Dallas, Texas. Various producers were contacted, and several meetings were held with producers and prospective producers of Grade A milk in the area. At these meetings various things were discussed, such as how the milk would be hauled, and what requirements would have to be met by the producers in order that their milk might meet the specifications of Grade A milk. These requirements included, in many instances, major changes in dairy barns and equipment. It was decided that the milk route would be feasible, and in the spring or summer of 1951 such a route was initiated.

The first milk hauler was a man named Ross Reed. Subsequently he sold whatever rights he had to Lloyd Sloan and O. J. Snyder. These two men operated the route until November 1, 1954, on which date they sold their equipment used on the route to plaintiffs herein, Wayne Whiteley and J. H. Whiteley, as evidenced by the following instrument (plaintiffs' Exhibit 1):

"We, Lloyd Sloan and O. J. Snyder, party of the first part, agree not to pickup any milk in the territory that is served by them, in what is called the Lincoln route or #800 Route. Now located south of #62 highway and East of Arkansas #59 highway. This territory is being sold to Wayne Whiteley of Westville, Oklahoma.
"Signed by /s/ Lloyd Sloan
"/s/ O. J. Snyder
"My Commission Expires 8–15–57
"/s/ L. J. Simmons
"L. J. Simmons, A Notary Public
"Bill of Sale
"We, Lloyd Sloan and O. J. Snyder of Westville, Oklahoma, sell

and Transfer their ownership of Milk Route #800 with 1953 G.M.C. Truck, to Wayne Whiteley of Westville, Oklahoma, effective of Nov. 1, 1954.

> "Signed by /s/ Lloyd Sloan
> "/s/ O. J. Snyder

"My Commission expires 8–15–57

"/s/ L. J. Simmons

"L. J. Simmons, A Notary Public."

### 3.

As a matter of fact, Wayne Whiteley was purchasing the route and equipment for himself and his father, J. H. Whiteley, as partners. The amount paid for the route and equipment was $6,000, which was substantially in excess of the value of the equipment alone.

Such milk routes are often bought and sold in northwest Arkansas, and it is quite common for a buyer to pay more than the value of the equipment, the excess payment being for the good will and agreement of the seller not to pick up any milk produced on the route.

### 4.

Plaintiffs hired drivers to operate the milk route in question. There were approximately 25 to 27 milk producers on the route, and each day plaintiffs' driver would pick up the milk from each of the producers. He would drive the milk truck up to the producer's dairy barn and put the milk on the truck, the milk being in ten-gallon metal cans. Since the milk was Grade A milk, it was necessary at all times to keep the temperature of the milk below 50 degrees.

After the driver collected the milk from all the producers, he would take the milk to Springdale, Arkansas, where it would be loaded on large semi-trailer trucks belonging to Skelton Brothers, Inc. Milk was taken from there to the defendant dairy's place of business in Dallas, Texas, where it was ultimately sold to consumers.

At Dallas, Texas, the milk would be weighed and graded. Weight tickets would be made out for each producer showing the amount of milk received from him. Also, the milk cans would be washed.

Then the empty milk cans and weight tickets would be returned by semi-trailer truck to Springdale, Arkansas, where they would be picked up by plaintiffs' driver and returned to the producers.

### 5.

There are approximately 235 Grade A milk producers in Washington County, Arkansas, and of this amount approximately 110 sell their milk to the defendant dairy. The remainder of the Grade A producers sell their milk to other companies, such as College Club and Meadow Gold.

In addition to the Grade A producers, there are approximately 1,500 Grade C milk producers in Washington County, Arkansas.

### 6.

The defendant dairy employed a field representative in the area, and at the times material herein the defendant, Guy Horner, was the field representative. His duties included the obtaining of new producers, working with the Dallas Health Department in seeing that the requirements of that department were met, and working with the milk producers, particularly in advising them of the equipment, etc., necessary for production of Grade A milk.

### 7.

Since the milk was ultimately sold in Dallas, Texas, the Health Department of that City employed an inspector who made periodic checks of conditions in Washington County with respect to the handling of the milk in order to determine whether the Grade A requirements were being met. During the time in question Percy J. Leach was the inspector for the City of Dallas. All the producers and haulers of Grade A milk for consumption in Dallas were required to have permits from that City and to comply with the requirements of the Milk Ordinance and Code of the City. Plaintiffs in the instant action had such a permit.

**8.**

The charge for the hauling of the milk was paid by the producers. The total cost was $1 per hundred pounds, 60 cents of that amount being for the haul from Springdale, Arkansas, to Dallas, Texas, and 40 cents being for the milk hauler who picked up the milk from the producers and took it to Springdale.

**9.**

Plaintiffs, through their employees, began operating the milk route on November 2, 1954, and continued to operate it until January 10, 1956. During that time their service became progressively, worse, and they received many complaints from producers. A few of the producers even made trips to the home of the plaintiff, Wayne Whiteley, in Westville, Oklahoma, to discuss various complaints. Among other things the producers complained that plaintiffs spilled substantial amounts of milk; failed to return weight tickets in order that the producers would have a record of the milk sold by them; lost the producers' milk cans; mixed up the milk cans and lids of different producers; returned the cans in a dirty condition; picked up the milk at irregular hours, thus making it difficult to keep the milk at proper temperatures; allowed the trucks to become dirty; failed to put the empty cans in proper racks; and were generally negligent and unsanitary.

In addition to registering complaints with plaintiffs, a substantial majority of the producers also complained to the defendant, Guy Horner, to the inspector, Percy Leach, and apparently to anyone else who might be able to do anything about the unsatisfactory situation.

Keith Skelton (who was originally a defendant in this action) operated a milk route near the route being operated by plaintiffs. A number of the producers on plaintiffs' route talked to Skelton and attempted to get him to haul their milk. At first Skelton refused to do so, since the producers were not on his route and since his route was already full.

As a general rule a milk hauler will not invade the territory of another milk hauler who is hauling milk to the same company.

Some of the producers contacted the defendant Horner and requested him to obtain a new hauler. Some of them recommended that he get Keith Skelton as a hauler.

The producers did not care who hauled their milk as long as the hauling was done properly.

**10.**

In the latter part of 1955 plaintiffs had negotiations with Carl Ishmael concerning the possible sale of the milk route by plaintiffs to Ishmael. Ishmael contacted the defendant Horner, and was advised that said defendant had no objection to Ishmael's purchase of the milk route. However, Ishmael was unable to raise the money and the sale was never consummated.

**11.**

Around the last of December, 1955, or first of January, 1956, the inspector, Leach, after having failed in previous attempts to get plaintiffs to comply with all pertinent regulations, informed the defendant Horner that he was going to suspend plaintiffs' permit. As a result of this information from Leach and the various requests from producers, Horner arranged with Keith Skelton or Skelton Brothers, Inc., to have said Skelton begin picking up milk on the route in question on Tuesday, January 10, 1956.

In the meantime, plaintiffs had been negotiating with Robert Oxford for the sale of the milk route to the said Oxford. Oxford tentatively agreed to pay $7,500 for the route and equipment. He was of the opinion that the equipment was worth approximately $3,500, and the remainder of the purchase price would have been for the route. On Sunday, January 8, Oxford contacted the defendant Horner to ascertain whether he had any objection to Oxford's purchase of plaintiffs' route. The defendant Horner advised Oxford that arrangements had been made for Skelton to operate the

route beginning on Tuesday. After receiving this information Oxford did not proceed further with the purchase of the route.

On Monday, January 9, 1956, the plaintiffs went to see the defendant Horner and were told by Horner of the plan to have Skelton operate the route. Plaintiffs stated that they would also operate on the route, but they were advised by Horner that if they did so operate, he would not purchase the milk hauled by them. Plaintiffs also asked the defendant Horner to give them something in writing showing that the route was being taken over by defendant, but Horner refused to do so.

Skelton, in fact, began picking up the milk on January 10, 1956, and plaintiffs made no further effort to pick up milk on this route.

### 12.

The producers would not have objected to the sale of the route by plaintiffs to Oxford provided Oxford did a proper job of handling their milk.

The producers had been well satisfied with the previous haulers, Reed, Sloan and Snyder. They have also been well satisfied with the service of Keith Skelton or Skelton Brothers, Inc., since January 10, 1956.

### 13.

Plaintiffs had no written contract with any of the producers, and in fact did not even contact the producers prior to purchasing the route. Likewise plaintiffs had no written contract with the defendant dairy.

The defendant dairy has never recognized the ownership of a route by a milk hauler.

### 14.

For various economic reasons producers are usually reluctant to stop selling milk to one company and to begin selling to another.

### 15.

Skelton Brothers, Inc., or Keith Skelton, now receives from the producers the same amount for picking up and hauling the milk that was received by plaintiffs when they were operating the route. Neither the defendant dairy nor the defendant Horner received any money by reason of the route being taken over by Skelton Brothers, Inc., or Keith Skelton. However, by the change in the haulers, the defendant dairy received assurance that the milk would be delivered in accordance with the requirements of the Dallas Health Department and in such a manner as to meet the specifications of Grade A milk. Likewise the producers were assured of a continuing market for their Grade A milk because of the readiness and willingness of Skelton Brothers, Inc., or Keith Skelton, to meet all requirements in the hauling and handling of Grade A milk.

### 16.

The plaintiff, Wayne Whiteley, testified that the plaintiffs received a gross income of from $600 to $900 per month while they operated the route. However, there was no positive testimony as to the net income received by plaintiffs but it seemed to be conceded by all parties that they did receive a substantial net income from the operation of the route.

### Discussion

Plaintiffs contend that they are entitled to recover against the defendants under either of two theories: (1) the law of conversion, and (2) an intentional invasion or interference by the defendants with the property and property rights of the plaintiffs. Plaintiffs also contend that the defendants acted in violation of the Sherman Anti-Trust Act and plaintiffs are entitled to recover treble damages.

The defendants contend that they did no unlawful or wrongful act and that they are not liable to the plaintiffs under any possible theory of law.

Little need be said with regard to plaintiffs' contention that defendants violated the Sherman Anti-Trust Act. There was absolutely no evidence that the defendants either intended to or did monopolize any part of the trade or commerce among the several states. As a matter of fact, insofar as the record

shows defendants have not received one ounce more milk since the alleged conversion than they received prior thereto. The only change brought about by the alleged conversion was a change in the person hauling the milk, and the new hauler was not shown to be an agent or employee of the defendant.

■■ Moreover, the only defendants now before the Court are the corporation, Foremost Dairies, Inc., and its agent, Guy Horner. Plaintiffs' theory is that Horner and the corporation were engaged in a conspiracy in restraint of commerce, but it is well settled that a violation of the conspiracy portions of the Sherman Anti-Trust Act cannot be committed by a corporation and its agents when said agents are acting for the corporation in the ordinary scope of their duties. Marion County Co-op Ass'n v. Carnation Co., D.C.W.D.Ark., 114 F.Supp. 58, 63. In the instant case Horner at all times was acting for the defendant dairy, and thus defendants could not be engaged in a conspiracy within the meaning of the Sherman Anti-Trust Act.

■ With respect to plaintiffs' contention that defendants converted the milk route in question, plaintiffs concede that they must prove three elements: (1) property in themselves; (2) conversion by the defendants; and (3) the value of the property.

In Plunkett-Jarrell Grocery Co. v. Terry, 222 Ark. 784, 791, 263 S.W.2d 229, 233, 44 A.L.R.2d 917, the court reviewed the Arkansas law of conversion, stating:

"We have many cases in this State which define 'conversion'. In Hooten v. State, 119 Ark. 334, 178 S.W. 310, 312, L.R.A.1916C, 544, Mr. Justice Hart approved this statement from Cooley on Torts:

" ' "Any distinct act of dominion wrongfully exerted over one's property in denial of his right or inconsistent with it, is a conversion." Cooley on Torts, 3d Ed., vol. 2, p. 859. "Anything which is the sub-

ject of property, and is of a personal nature, is the subject of conversion." Id. 856.'

"In Barnett Bros. Mercantile Co. v. Jarrett, 133 Ark. 173, 202 S.W. 474, 475, Chief Justice McCulloch approved the following definition of conversion:

" ' "The wrongful assumption or dominion over property of another in subversion and denial of his rights constitutes a conversion of such property, irrespective of whether there was a demand made for the surrender and refusal to surrender said property." '

In Thomas v. Westbrook, 206 Ark. [841] 843, 177 S.W.2d 931, 932, it was recognized that conversion could be constructively accomplished; and Mr. Justice Robins said:

" 'Conversion is ordinarily said to consist of the exercise of dominion over the property in violation of the rights of the owner or person entitled to possession. The evidence as to appellee's conversion of the market equipment is rather meager, but it seems to be undisputed that he did change the lock on the door of the building in which the property was situated. By so doing he brought about a situation under which appellant, Willard, was denied access to the property and he (Westbrook) alone could enter the building. Such an act was held by the supreme court of New Hampshire in the case of Jones v. Stone, 78 N.H. 504, 102 A. 377, to amount to conversion of chattels within the building.' "

In the instant case it must first be determined whether plaintiffs owned property which was the subject of conversion. When plaintiffs purchased the milk route from Sloan and Snyder, they acquired three things: (1) the equipment, (2) the promise of Sloan and Snyder not to pick up any milk on the route, and (3) the good will, if any, that

Sloan and Snyder had established with the producers.

Plaintiffs had no contracts with the producers and no contract with the defendant dairy. Nor did the defendant dairy have contracts with the producers. In other words, (a) there was nothing to require the producer to sell milk to the defendant dairy; (b) there was nothing to require the defendant dairy to purchase milk from the producers; (c) there was nothing to require the plaintiffs to pick up the producers' milk; (d) there was nothing to require the producers to permit plaintiffs to pick up their milk; (e) there was nothing to require plaintiffs to haul milk to the defendant dairy; and (f) there was nothing to require the defendant dairy to purchase milk that was hauled by the plaintiffs.

In other words, there was no contractual relation of any kind requiring any of the parties to act or to refrain from acting with respect to the milk.

■ Under these circumstances the Court is convinced that plaintiffs owned nothing which was the subject of conversion except their equipment and, of course, the equipment was not touched by defendants.

As heretofore stated, the only possible thing plaintiffs owned, other than the equipment and promise of Sloan and Snyder, was the good will, if any, established with the producers. There is a serious question whether good will is an item that could be the subject of conversion. See, Powers v. Fisher, 279 Mich. 442, 272 N.W. 737 (holding that there could be no conversion of good will). But assuming that good will is something that could be converted, in the instant case defendants took no action designed to interfere with plaintiffs' good will. (As a matter of fact, plaintiffs by their mishandling of the route had destroyed any good will that had existed when they first began operating the route.) All the defendants did was to secure Skelton Brothers, Inc., through Keith Skelton to operate a truck on the route. There was nothing to prevent plaintiffs from operating a truck on the same route if the producers agreed and another market was secured. In other words, after Skelton Brothers, Inc., began operating on the route plaintiffs still had their equipment, still had their promise from Sloan and Snyder, and still had the right to haul milk for any of the producers who were willing for them to do so to any company which might want to purchase the milk. In this connection, compare, Olschewski v. Hudson, 87 Cal.App. 282, 262 P. 43, 44, where the court said:

"Manifestly a laundry route does not consist solely of a specific district or territory, nor does it consist of a vested right to, or monopoly of, the patronage of all the residents of said district. Competing laundry companies may possess independent lists of customers residing in the same house, block, or district. Obviously, a customer of one laundry company today, for good and valid reasons, or for no reason whatever, may become the customer of a competing company tomorrow. For friendship, whim, better service, or cheaper prices, a customer may change his laundry at will. No laundry company may have a vested property right to claim, as customers, particular individuals, nor all the residents of a specific district. The field is open for fair competition on the part of any and all who desire to solicit patronage."

See also, Adkins v. Model Laundry Co., 92 Cal.App. 575, 268 P. 939.

In the instant case the persons who had the final say were the producers. It was their milk and they were privileged to sell it to whom they pleased. They were also privileged to have the milk hauled by anyone of their choosing. As a result of the mismanagement of the route by plaintiffs and their employees, a substantial number of the producers requested the defendant Horner to obtain a new hauler for them, and some

of the producers specifically requested Skelton Brothers, Inc. In obtaining Skelton to operate a truck on the route defendants were not converting the route to their own use, but were merely acting on behalf of the producers and at their request.

All that has been said concerning the issue of conversion applies with equal force to plaintiffs' theory of intentional invasion of their property rights. As above stated, the plaintiffs had no property rights which were invaded or interfered with by defendants. In this connection, see and compare, Wilkinson v. Powe, 300 Mich. 275, 1 N.W.2d 539 (involving intentional procurement of breaches of contract where milk hauler had written contracts with producers, and it was not shown that the producers were dissatisfied with the hauler's services).

There is still another reason for denying a recovery by plaintiffs in this action. The burden was upon plaintiffs to prove the amount of their damages, and this they failed to do. Plaintiffs did establish they had received a tentative offer of $7,500 for the milk route, and they contend that they are entitled to recover that amount. However, plaintiffs are completely overlooking the fact that defendants did not touch their equipment, which, no doubt, was used by plaintiffs in serving their other milk routes. Plaintiffs made no attempt to establish the fair market value of the equipment which would have been sold to Oxford had the sale been consummated. Oxford did testify that in his opinion the equipment was worth approximately $3,000 to $3,500, but there was no showing that he was qualified to express an opinion as to the value of the equipment. Without a determination of the value of the equipment, the Court could not determine the true amount of plaintiffs' loss, if any.

In the last analysis the Court is inclined to agree with the statement in defendants' brief that "the plaintiffs were the architects of their own misfortune". Plaintiffs' own mismanagement of the route was the sole proximate cause of any loss sustained by them, and there is no legal theory by which plaintiffs can shift their loss to the defendants.

### Conclusions of Law

**1.**

The Court has jurisdiction of the parties and the subject matter herein.

**2.**

The defendants did not violate the provisions of the Sherman Anti-Trust Act.

**3.**

The defendants did not convert any property owned by plaintiffs and did not invade or interfere with any property or property rights of the plaintiffs.

**4.**

Plaintiffs are entitled to recover nothing of and from the defendants.

**5.**

The complaint of the plaintiffs should be dismissed with prejudice.

A judgment in accordance with the above should be entered.